UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA                    CRIMINAL ACTION

v.                                          NO. 16-174

SHANNON CEASAR                              SECTION "F"


ORDER AND REASONS

Before the Court is the defendant's motion for reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons that follow, the motion is DENIED.


**Background**

Shannon Christopher Ceasar was a medical doctor who operated a pill mill,[1] defrauded healthcare benefit programs by issuing fraudulent prescriptions, and threatened to kill law enforcement officers with the Drug Enforcement Administration when he suspected he was under investigation.[2]  He is currently serving

---

[1] As defined in the Factual Basis, "pill mill" is an operation in which, under the guise of offering "substance abuse treatment" or "pain management treatment," then-Dr. Ceasar prescribed controlled substances, including Oxycodone, to drug seekers and drug abusers without a legitimate medical purpose and in exchange for a flat cash fee.

[2] Ceasar pled guilty to three counts of a superseding bill of information charging: conspiracy to distribute and dispense medically unnecessary drugs like oxycodone, in violation of 21 U.S.C. § 846; threatening to assault or murder federal law

1

three concurrent 120-month sentences of imprisonment at FCI Oakdale.

The sentence imposed was below the 210-240 months advisory guideline range calculated by the U.S. Probation Office.[3]  Several sentencing enhancements informed his advisory guideline range, but both the government and the defendant moved for a below-guidelines sentence for a number of reasons including Ceasar's acceptance of responsibility and history of myriad health conditions and substance abuse issues.  Having served approximately half of the 120-month term of imprisonment, Ceasar now asks the Court to reduce his sentence based on health concerns exacerbated by the ongoing COVID-19 pandemic.

I.

Courts generally "may not modify a term of imprisonment once it has been imposed[.]" 18 U.S.C. § 3582(c).  Few exceptions apply. Since passage of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018), federal courts "may reduce the term of imprisonment" upon an inmate's request and demonstration of certain criteria. § 3582(c)(1)(A); see also United States v.

_____

enforcement officers, in violation of 18 U.S.C. § 115(a)(1)(B); and committing and attempting to commit health care fraud, in violation of 18 U.S.C. §§ 1347(a) and 2.

[3] Because the high end of the advisory guidelines range of 210-262 months exceeded the statutory maximum sentence of 20 years, the guideline imprisonment range was 210-240 months.

Chambliss, 948 F.3d 691, 692-93 (5th Cir. 2020)(As amended, §
3582(c) provides that the Court "on a motion by the BOP or by the
defendant after exhausting all BOP remedies, may reduce or modify
a term of imprisonment, probation, or supervised release after
considering the factors of 18 U.S.C. § 3553(a), if 'extraordinary
and compelling reasons warrant such a reduction.'").[4]

"The First Step Act and COVID-19 have redefined the
compassionate release landscape." United States v. Jones, 980
F.3d 1098, 1100-01 (6th Cir. 2020)("The First Step Act of 2018's
provision allowing incarcerated persons to file their own §
3582(c)(1)(A) motions coupled with COVID-19's pernicious presence
in federal prisons triggered a massive upswing in imprisoned
persons seeking compassionate release; 10,940 persons applied for
compassionate release in the first three months of the pandemic
alone."). A new statutory remedy coupled with an historic pandemic
presenting unique challenges to institutional living environments
has triggered a perfect storm for interpretation conflicts in the
case literature. The Court first considers the threshold issue of
exhaustion before turning to address the conflicts implicated in
the parties' submissions and ultimately proceeding to consider
whether Ceasar is entitled to a sentence reduction.

---

[4] Before 2018, only the Bureau of Prisons could request that a
court modify a prisoner's sentence.

II.

*A.*

Respecting exhaustion, Congress allows courts to consider requests seeking sentence reductions

> upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such request by the warden of the defendant's facility, whichever is earlier....

§ 3582(c)(1)(A). The statute's requirement that an incarcerated person seeking compassionate release must file a request with the Bureau of Prisons before filing a motion in federal court imposes a non-jurisdictional, "mandatory claim-processing rule" that a "court *must* enforce" when "properly raised" by the Government. See United States v. Franco, 973 F.3d 465, 468 (5th Cir. 2020), cert. denied, 2020 WL 7132458 (U.S. 12/7/20)(emphasis added in Franco, quoting Pierre-Paul v. Barr, 930 F.3d 684, 692 (5th Cir. 2019)). When an inmate's request is administratively denied before 30 days have lapsed, the statute's exhaustion requirements have been inconsistently construed: some courts hold that, regardless of whether the warden responds, compassionate release petitioners must either exhaust administrative appeals or wait 30 days after requesting relief from the warden; others hold that a compassionate release petitioner must fully exhaust administrative appeals if

4

the warden timely denies a request.  This debate is merely academic here, where the government embraces the Department of Justice's position aligned with the former interpretation, that is, that a compassionate release petitioner must either exhaust administrative appeals *or* wait 30 days after the warden receives request.

*B.*

Here, more than 30 days after petitioning the warden for compassionate release, Ceasar filed the present motion.  As a threshold matter, the government concedes that Ceasar has satisfied the mandatory exhaustion requirement to pursue this motion for compassionate release.[5]  Accordingly, the Court turns

---

[5] It is undisputed that Ceasar requested compassionate release from the warden on July 2, 2020, the request was denied on July 17, 2020, and Ceasar's July 29 administrative appeal was denied on October 2, 2020.  The government notes that Ceasar did not appeal to the next level, BOP's General Counsel.  That the government nevertheless concedes that Ceasar has complied with the mandatory exhaustion requirement indicates that the government endorses what appears to be general DOJ policy:  the exhaustion requirement is met once 30 days have passed from the receipt of an inmate's request to the warden; policy that conforms with one interpretative camp in a split of authorities.  Compare United States v. Harris, 812 Fed.Appx. 106, 107 (3d Cir. 2020)(noting that the DOJ conceded that its exhaustion argument requiring an administrative appeal of the warden's denial was incorrect, agreeing that the argument was error, and concluding in a non-precedential opinion that the statute allowed two ways to proceed to district court as long as the inmate first made a request to the warden) and United States v. Haney, 454 F. Supp. 3d 316, 321 (S.D.N.Y. 2020)(finding that the "hybrid" exhaustion requirement allows incarcerated persons to "either exhaust [administrative appeals] or wait 30 days") with

to consider the merits of Ceasar's request for a sentence reduction.

## III.

### *A.*

Three substantive criteria guide the Court's discretion in determining whether an incarcerated person has demonstrated that a sentence reduction is warranted:

- "extraordinary and compelling reasons warrant ... a reduction";[6]
- the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission"; and
- the applicable sentencing factors in § 3553(a) support a reduction.

---

e.g., United States v. Gunn, 980 F.3d 1178, 1179 (7th Cir. 2020)(indicating, in dicta, that the statute permits courts "to grant compassionate release on a prisoner's own request, provided that the prisoner first allowed the [BOP] to review the request and make a recommendation (or it let 30 days pass in silence)."); United States v. Martin, No. 16-70, 2021 WL 197296, at *2-3 (S.D. Miss. Jan. 20, 2021); United States v. Rodriguez, No. 15-198, 2020 WL 5369400, at *2-3 (E.D. La. Sept. 8, 2020)(Feldman J.); United States v. Delco, No. 09-57, 2020 WL 4569670, at *4 (E.D. La. Aug. 7, 2020)(Ashe, J.); United States v. Ellis, No. 13-286, 2020 WL 4050409, at *2 (E.D. La. July 20, 2020)(Vance, J.); United States v. Ng Lap Seng, 459 F. Supp. 3d 527, 535-36 (S.D.N.Y. 2020)(collecting cases). The Fifth Circuit has acknowledged the split but has not resolved the issue. See United States v. Ward, 832 Fed.Appx. 334 (5th Cir. 2020)(unpublished, per curiam)(finding it unnecessary to resolve the interpretation issue because Ward failed to wait 30 days and, thus, failed to exhaust his claim under either construction).

[6] "Extraordinary and compelling reasons" is found at subsection (i); Ceasar is ineligible for relief under subsection (ii) because he is not "at least 70 years of age," and he has not "served at least 30 years in prison[.]" 18 U.S.C. § 3582(c)(1)(A)(ii).

See 18 U.S.C. § 3582(c)(1)(A).[7]  As the petitioner, Ceasar has the burden to show that a sentence reduction is warranted.  See United States v. Jones, 836 F.3d 896, 899 (8th Cir. 2016); United States v. Green, 764 F.3d 1352, 1356 (11th Cir. 2014).  Notably, and ultimately dispositive here, even if a compassionate release petitioner is eligible relief (i.e., he demonstrates that extraordinary and compelling reasons warrant a sentence reduction), consideration of applicable § 3553(a) factors may nevertheless persuade the Court to exercise its discretion to deny the motion.  See Chambliss, 948 F.3d at 693-94 (affirming the district court's denial of motion seeking sentence reduction in light of the § 3553(a) factors, notwithstanding the petitioner's terminal disease constituting an extraordinary and compelling reason for a reduction).

*B.*

Congress does not define "extraordinary and compelling reasons" but, rather, delegated that task to the Sentencing

---

[7] Relying on the parallel language of Sections 3582(c)(1) and (c)(2), the Sixth Circuit has determined that Dillon v. United States, 560 U.S. 817 (2010) confirms that § 3582(c)(1)(A) calls for a sequenced three-party inquiry, with the second step inapplicable to prisoner motions because there is no "applicable" policy statement to consult.  See United States v. Jones, 980 F.3d 1098, 1106-07 (6th Cir. 2020)(describing § 3582(c)(1)(A)'s phrasing as "confusing" with "oddly placed commas" and ultimately determining that the second "applicable policy statement" portion of the step is inapplicable to prisoner motions).

Commission, which defines "extraordinary and compelling reasons" in the advisory notes to a policy statement found at U.S.S.G. § 1B1.13.  Whether the First Step Act rendered § 1B1.13 inapplicable (or otherwise downgraded it from binding to merely helpful) in cases where an incarcerated person files a motion for compassionate release such that district courts have full discretion to determine whether "extraordinary and compelling" reasons justify compassionate release is fodder for debate in the case literature; a debate that remains unresolved in the Fifth Circuit.

U.S.S.G. § 1B1.13 -- the only *potentially* "applicable policy statement" -- implements the compassionate release statute. "Provided [that] the defendant" is not a danger to the safety of any person or to the community, the policy statement's application notes offer four categories of extraordinary and compelling reasons: medical conditions, age, family circumstances, and "other" reasons -- the latter, a catchall expressly conferred to the discretion of the Director of the Bureau of Prisons.  <u>See</u> <u>id.</u> cmt. n.1(A)-(D).  Notably, the policy statement (i) is expressly constrained to motions and determinations by the Director of the Bureau of Prisons, not prisoner motions;[8] and (ii) has not been

---

[8] <u>See</u> U.S.S.G. § 1B1.13 ("Upon motion of the Director of the Bureau of Prisons...") & cmt. n.1(D)("As determined by the Director of the Bureau of Prisons...") & cmt. n.4("[a] reduction under this policy statement may be granted only upon a motion by the Director of the Bureau of Prisons").

amended since the First Step Act expanded the compassionate release remedy to prisoner-initiated motions.[9]  As such, an increasingly resounding consensus finds that the Sentencing Commission has not yet issued a policy statement "applicable" to prisoner requests for sentence reductions.  See, e.g., United States v. McCoy, 981 F.3d 271, 281-82, 286-87 (4th Cir. 2020)(joining the Second, Sixth, and Seventh Circuits in holding that there currently exists no "applicable policy statement" governing prisoner motions such that district courts may consider any extraordinary and compelling reason for release raised by a petitioner, including the severity of the defendants' sentences, coupled with the disparity between those sentences and sentences they would receive today); United States v. Gunn, 980 F.3d 1178, 1180-81 (7th Cir. 2020)(because the U.S.S.G. lacks an "applicable" policy statement, "the trailing paragraph of § 3582(c)(1)(A) does not curtail a district judge's discretion" although the Sentencing Commission's analysis may guide discretion); United States v. Jones, 980 F.3d 1098, 1111 (6th Cir. 2020)(where incarcerated persons seek compassionate release, district courts "have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13."); United States v. Brooker, 976 F.3d 228, (2d

---

[9] And, as the Second Circuit has observed, no update is forthcoming given that the Commission presently lacks a quorum.  United States v. Brooker, 976 F.3d 228, 234 (2d Cir. 2020).

Cir. 2020)(generally holding that the First Step Act allows courts to exercise discretion, unconstrained by U.S.S.G. § 1B1.13, to determine what reasons are "extraordinary and compelling" and specifically finding that an unduly lengthy sentence is a circumstance a court may consider in determining whether extraordinary and compelling reasons justify a sentence reduction).[10]

Consideration of these authorities persuasively suggests that the "trailing paragraph" of § 3582(c)(1)(A) -- which requires that a reduction be consistent with applicable policy statements -- does not limit the district court's discretion because § 1B1.13 is a policy statement not "applicable" to, much less binding on, prisoner-initiated applications for compassionate release.   The Fifth Circuit has yet to weigh in on the split, other than to

---

[10] Compare these authorities with, e.g., Rec.Doc. 95, p. 11 n.16 ("the government maintains that policy statement remains binding and empowers defendants to seek relief from the Court as defined in Application Note 1(A) through (C) [but that] the BOP retains sole authority to identify other reasons beyond those set forth in Application Note 1(A) through (C).") and p. 12 n.17 ("the government's position is that the policy statement is binding"); United States v. Aruda, 472 F. Supp. 3d 847 (D. Haw. 2020)(collecting district court cases)(determining that the Sentencing Commission's commentary in the application notes to U.S.S.G. § 1B1.13 is binding interpretation of "extraordinary and compelling" and rejecting the defendant's proffered "freewheeling approach to compassionate release" in favor of the Supreme Court's pronouncement in Stinson v. United States, 508 U.S. 36, 39 (1993) that courts are not permitted to treat the Sentencing Commission's commentary as merely "persuasive" authority).

suggest that § 1B1.13 is at least helpful, non-binding authority on what qualifies as extraordinary and compelling. See United States v. Thompson, 984 F.3d 431, 433 (5th Cir. 2021)(noting that the commentary to § 1B1.13 is "not dispositive" but "informs our analysis" and expressly "opt[ing] not to weigh in on the split of authority as to whether ... courts properly can invoke [§1B1.13's] catch-all provision"); see also United States v. Byrd, --- Fed.Appx. ---, 2021 WL 435105, at *2 (5th Cir. Feb. 8, 2021)(unpublished, per curiam)(the district court did not err insofar as it consulted the definitions in § 1B1.13 as helpful, non-binding guidance); see also United States v. Rivas, 833 Fed.Appx. 556 (5th Cir. 2020)("Though not dispositive, we are guided in our analysis by the commentary for U.S. Sentencing Guidelines § 1B1.13[.]"); see also United States v. Gonzalez, 819 Fed.Appx. 283, 284 (5th Cir. 2020)(per curiam)(finding no error insofar as the district court "relied on its own judgment" in denying prisoner motion; contrary to the defendant's contention, "there is no indication in the district court's order that it treated U.S.S.G. § 1B1.13 'as the dispositive boundary of what may be judicially determined to be extraordinary and compelling reasons for a sentence reduction for medical reasons.'"); but see United States v. Bell, 823 Fed.Appx. 283, 284 (5th Cir. 2020)(unpublished, per curiam)(denying motion to proceed IFP and dismissing appeal as frivolous where Bell "failed to identify an

extraordinary and compelling reason for compassionate release that is 'consistent with applicable policy statements issued by the Sentencing Commission'").

Putting aside the inconsistency in the case literature concerning whether § 1B1.13 is a policy statement "applicable" to inmate requests for sentence reductions (and if so whether the policy statement is binding), the Court turns to consider whether Ceasar has shown that extraordinary and compelling reasons warrant relief. Insofar as the Fifth Circuit directs that § 1B1.13 may be helpful to the task, relevant here,[11] the policy statement indicates that "extraordinary and compelling reasons" are presented if the defendant is

> (I) suffering from a serious medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

---

[11] It is undisputed that Comment Note 1(A)(i) is not implicated insofar as Ceasar is not suffering from a terminal illness such as "metastic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." Nor does Ceasar invoke age or family circumstances that might qualify as extraordinary or compelling circumstances. See U.S.S.G. § 1B1.13, cmt. n.1(B)-(C).

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii).[12]

*C.*

The government (haltingly) concedes that the policy statement standard it urges the Court to apply to determine whether Ceasar has presented extraordinary and compelling reasons for early release results in a finding that Ceasar has medical conditions that constitute an extraordinary and compelling reason for a sentence reduction. Essentially, the government argues that an inmate who has one of the conditions which the CDC identifies as definitively placing that inmate at a greater risk for an adverse outcome should he contract COVID-19 "suffers from a serious medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" consistent with the Sentencing Commission's policy statement.

_____

[12] Ceaser invokes neither the age nor family circumstances components of the application note. The application note also confers on the BOP the authority to identify "other reasons" beyond those set forth in the application note. See id., cmt. n.1(D). The government submits that BOP retains sole authority to determine any "other reasons" beyond those set forth in application note 1(A) through (C). As indicated, the government's position that the policy statement is binding clashes with the text of U.S.S.G. § 1B1.13, its application notes, and a growing consensus in the case literature, as well as the Fifth Circuit's limited consideration, albeit in unpublished opinions or dicta.

It is undisputed that type II diabetes and obesity (body mass index of 30 or higher) have been recognized by the CDC as being health conditions with severe risk of complications from COVID-19.   See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-coditions.html  And, hypertension and HIV are conditions that the CDC indicates "might" increase the risk of severe illness.  See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

The medical records show that 48-year-old Ceasar suffers from type II diabetes, hyperlipidemia (high cholesterol and triglycerides), hypertension, asymptomatic HIV, a history of colon cancer that has been in remission since 2014, and as of January 2020, Ceasar's body mass index of 30.2 qualifies him as obese.  As the government points out, a few of these chronic conditions predated his incarceration and were considered by the Court when a below-guidelines sentence was imposed.  There is no dispute that Ceasar's health is presently stable and managed by medical personnel at BOP, and that he receives treatment and necessary medication for his chronic conditions (diabetes, hypertension, hyperlipidemia, HIV, and pain).

Ceasar submits that his various health conditions, some of which appear on the CDC list of conditions that place a person at an increased risk of severe illness from COVID-19 and others which

14

appear on a list of conditions that "might" increase the risk of severe illness, qualify as extraordinary and compelling reasons supporting early release from prison.  The government counters that an inmate who has a condition which the CDC indicates "might" increase the risk of severe illness falls short of presenting an "extraordinary and compelling reason" for compassionate release under the statute and U.S.S.G. § 1B1.13.[13]  But the government nevertheless concedes that Ceasar's type II diabetes and obesity are recognized by the CDC to be conditions that place Ceasar at an increased risk of severe illness from COVID-19 and, therefore, Ceasar demonstrates an extraordinary and compelling circumstance that "passes the eligibility threshold as defined by the" sentencing guideline.[14]

---

[13] The government also argues that insofar as Ceasar's request for a sentence reduction based on health conditions that the CDC does not recognize as increasing the risk of severe COVID-19 complications, "his motion is tantamount to a generalized concern about the threat of COVID-19 and should be denied."  To be sure, generalized concerns about the virus are insufficient to trigger eligibility for relief.  But Ceasar and two of his several chronic health conditions meet even the government's more stringent extraordinary and compelling circumstances test.

[14] More than once in its briefing, the government unqualifiedly suggests that Ceasar's type II diabetes (and obesity, although the government would prefer more updated documentation on Ceasar's precise body mass index) technically qualify as extraordinary and compelling reasons warranting a sentence reduction under the government's (albeit, hyper-technical) conception of and assumption that the "applicable" Sentencing Guideline applies: "during the COVID-19 pandemic, an inmate who presents one of the risk factors on that [CDC] list, as confirmed by medical records, and who is not expected to recover from that condition, presents

Because the Court agrees with the government that the applicable § 3553(a) factors weigh against Ceasar's release, the Court declines to attempt to reconcile the government's dichotomous arguments on eligibility and assumes for the sake of argument that cumulating Ceasar's chronic health conditions -- some that might ... and two that do ... present a severe risk of complications from COVID-19 -- qualify as extraordinary and compelling circumstances supporting a sentence reduction.[15]

---

an extraordinary and compelling reason allowing compassionate release under the statute and guideline policy statement", Rec.Doc. 95 at p. 14; an inmate who presents one of the risk factors on the CDC list presents "'a serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover,' U.S.S.G. § 1B1.13 cmt.n.1(A)(ii)(I), in that the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the chronic condition itself." Rec.Doc. 95 at p.14. Even so, the government then hedges on eligibility by suggesting that Ceasar is not terminally ill and that his conditions do not prevent him from providing self-care within his correctional facility given that the conditions are controlled with medication, monitoring, and counseling. It is certainly permissible for the government to advance alternative arguments, but any persuasive appeal is lost when diametrically opposed arguments are advanced, one of which ostensibly defies general DOJ policy.

[15] The Court is mindful that individuals with certain health conditions are more vulnerable to adverse health effects if they contract COVID-19. To be sure, the Centers for Disease Control and Prevention advises that people with certain conditions, such as chronic obstructive pulmonary disease, type II diabetes, and obesity, are at an increased risk of severe illness from COVID-19, and further cautions that people with certain other conditions, including hypertension, *might be* at an increased risk for severe illness from COVID-19. Thus, COVID-19 is relevant to the

*D.*

Even if the Court accepted the defendant's and the government's (albeit half-hearted) submission that Ceasar's myriad health conditions, particularly those the CDC has indicated make him uniquely susceptible to an adverse outcome should he be infected with COVID-19, coupled with pandemic conditions at Oakdale I, constitute extraordinary and compelling circumstances, the government submits that consideration of the applicable section 3553(a) factors and the fact that Ceasar remains a danger to the community weigh against early release.   The Court agrees.

The compassionate release statute directs the Court to consider the factors set forth in § 3553(a) to the extent they are applicable.  These factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, as well as to afford adequate deterrence and protect the public from further crimes of the defendant; (3)

---

compassionate-release analysis.   However, there is no magic formula to achieve compassionate release: one does not "qualify" for release during a pandemic by invoking a particular listed health condition.  The pandemic and the nature of the defendant's particular health condition and circumstances are part of the extraordinary and compelling circumstance statutory calculus guiding this Court's discretion in determining eligibility for a sentence reduction.

the kinds of sentences available; (4) the kinds of sentence and sentencing range established for the applicable category of offense or defendant; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records; and (7) the need to provide restitution to any victims of the offense. § 3553(a).[16]

Here, Ceasar has been assessed as having a "low" risk of recidivism, but that risk is higher than the necessary "minimum" risk for the BOP to release him early to home confinement; a risk assessment based on the violent nature of one of the underlying offenses.[17] Ceasar has served approximately half of his 120-month sentence; a sentence that was well below the guideline range of 210-240 months. Each of Ceasar's underlying offenses of conviction are serious; in addition to the drug and economic offenses, one of them is a violent offense. Ceasar operated a pill mill in which he as a doctor took advantage of vulnerable drug addicts for personal gain and pleasure; inflicting serious harm on a community

---

[16] Balancing the applicable factors falls within the Court's discretion and mere disagreement with how the factors are balanced is insufficient to warrant relief on appeal. United States v. Chambliss, 948 F.3d 691, 694 (5th Cir. 2020).

[17] Again invoking U.S.S.G. § 1B1.13 and its advisory notes, the government also submits that Ceasar has failed to show that he is not a danger to the safety of any other person or to the community as provided in 18 U.S.C. § 3142(g). See U.S.S.G. § 1B1.13(2). Particularly considering the nature and circumstances of his offenses, the Court agrees and observes that the factors set forth in § 3142(g) are similar to those set forth in § 3553(a).

he had pledged to serve.  And the threats he made to murder law enforcement officers coupled with the corroborating number of firearms seized from his home are particularly egregious.  The Court is reminded of the factual basis supporting the parties' plea agreement, which stated that, on the morning of July 20, 2016, Ceasar made repeated threats to kill law enforcement officers, recorded during a telephone call with two confidential sources:

- "God help them I swear to God ... I have a fucking arsenal in there enough to supply a small militia, you know I collect guns, I swear to God if they come in there with a warrant I'm going to kill every single one of those sons of bitches."

- "These motherfuckers are trying to fuck with doctors trying to help people, they're not police, they are the scumbags ... they are pieces of garbage.  They weren't smart enough to make it to be a real cop so they got ... to either narcotics and DEA which is a complete and utter failure and waste of time. No matter who they arrest ... they will never ever win the war on fucking drugs[.] But if they come into my fucking clinic they're going to get a big surprise, because I'm going fucking kill them and send them home in a body bag[.]  I'll tell them that to their face. If you come into my fucking clinic, you're going to get a bullet in your fucking skull."

- "I am very serious... they won't even be able to have an open casket funeral. There will be nothing left above the adam's apple."

- "if they come in being assholes, or the medical board, if they happen to fuck with me again, they are all going to die. Every single one of them."

- "Fuck it. I'm going to do what I want and if and when they come they are going to get a big surprise because I'm not just your average doctor. I'm going to blow their fucking heads off."

- "Only a complete and total worthless waste of oxygen piece of garbage human being would not only be a DEA agent. Period.

But to go after doctors when there are fucking drug dealers everywhere[.] That is why they deserve to die."

- "And I'm not even sure if the time comes if I'm going to do it right there in the clinic or if I'm going to somehow break into the DEA office in that building by the lake and just fucking blow the place up but somehow a vast majority of the DEA agents in this area will lose their lives if they fuck with me."

- "If they come and say we have too many Suboxone patients or anything like that or, you know, any kind of bullshit like that, then...New Orleans will be all over the national news again because of me."

- [Apparently referring to the shooting death of three police officers in Baton Rouge a few days earlier, Ceasar stated:] "What I'll do is make Baton Rouge look like a fucking kindergarten."

Two days after these threats were made, law enforcement arrested Ceasar; in executing a search warrant was executed at his house in Uptown, New Orleans, law enforcement recovered 33 firearms, including a variety of rifles, revolvers, pistols, and shotguns. The nature and circumstances of these offenses weighs heavily against release.

A sentence below 120 months, itself well below the guidelines, would not reflect the seriousness of the offenses, promote respect for the law, or provide just punishment, let alone afford adequate deterrence or protect the public. Ceasar's serious and chronic medical conditions, which appear to be well managed in prison, are outweighed by the danger he poses to public safety and the applicable § 3553(a) factors, particularly the nature and

circumstances of Ceasar's offenses, the need for his sentence to reflect the seriousness of those offenses, provide just punishment, afford adequate deterrence, all of which weigh against releasing Ceasar after serving half of a below-guidelines sentence. Even in hindsight and considering Ceasar's medical vulnerabilities and post-sentencing rehabilitation efforts in prison, the sentence imposed, which was below the advisory guidelines, remains sufficient but not greater than necessary to achieve the purposes articulated in § 3553(a). Weighing the applicable factors compels a finding that Ceasar's motion seeking a sentence reduction should be denied.

Finally, insofar as Ceasar requests that the Court place him on home confinement, the Court lacks authority to do so.[18]

---

[18] That Ceasar has failed to carry his burden to show that he is entitled to a sentence reduction renders academic the debate among the parties concerning whether the Court technically has the authority to order a prisoner's release to home confinement. Only if the Court had granted Ceasar's motion seeking a sentence reduction and imposed home confinement as a condition of supervised release could the Court override BOP's sole authority to designate placement. See 18 U.S.C. §§ 3582(c)(1)(A), 3583(d), 3583(e)(2); see also U.S.S.G. § 5F1.2. Otherwise, and generally speaking, the Court lacks authority to simply order that Ceasar serve the remainder of his custodial sentence on home confinement. See 18 U.S.C. § 3621(b)(BOP is authorized to designate placement but will consider sentencing court's recommendation); see also § 3582(c)(limiting the Court's authority to modify or reduce a sentence). Whether Ceasar should be moved to home confinement is BOP's prerogative; the Attorney General has provided pandemic guidance to BOP, which undertakes a screening process to determine whether home confinement is warranted under all the relevant

\*\*\*

Accordingly, IT IS ORDERED: that the defendant's motion seeking compassionate release is DENIED.

New Orleans, Louisiana, February 18th, 2021

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

circumstances. As it must, the Court defers to the BOP administrative process concerning requests for home confinement due to COVID-19 concerns.